MARTIAL DODEMAN et al. *v.* R. R. BARROW.

The laws requiring transfers of immovables to be in writing, would be vain and illusory, if the thing
sold were not required to be described in writing. In forced sales, especially, it is necessary for
the description to be such as to warn the public what is intended to be sold; that the purchaser
may be able to identify the object of his purchase, and that the property of the original owner
may not be sacrificed by a sale in the dark.

The adjudication by the State Treasurer of "six arpents, more or less, in the parish of Assumption,"
unaccompanied by a delivery of possession, did not convey a legal title to the specific land claim-
ed in this action.

The monition law cannot cure such a substantial defect as this.

The only *indicia* of taking possession by defendant—to make a basis for prescription—before 1844,
were that in 1840, he sent hands to aid in stopping a crevasse in front of the tract in question,
and that the next year, some of his negroes worked on a road and levee running over a part of
it. *By the court:* It would be contrary to the text and meaning of the Code to declare these *in-
dicia* sufficient to establish such an unequivocal corporal possession—*animo domini*—as is re-
quired to mark the commencement of the prescription of ten years. Defendant had other lands
in the-vicinage. He had an obvious interest in stopping the crevasse and assisting to keep the
road and levee in repair, and his doing so did not clearly indicate an intention to take possession
of this piece of land as owner.

The land in dispute was abandoned by plaintiffs in 1827 or 1828. It is not shown that they exercised
any act of ownership over the land from that period until the institution of this suit,—a period of
twenty-two or three years,—and under Article 3467 C. C., it would seem that the plaintiffs have
lost their civil possession, because they did not pay taxes, keep up the roads and levees, or do
other similar acts. (MERRICK, C. J., dissenting.)

While on the one hand, the positive acts of defendant show possession before 1844, much can be in-
ferred, on the other, from the passive conduct of plaintiffs, which seems to have amounted to an
intention of ridding themselves of the burden of taxes and keeping up levees, by abandoning the
property to the purchaser at the tax sale and his vendees. (MERRICK, C. J., dissenting.)

Three-fourths of the territory of the State, consisting of forests, prairies, swamps and wood lands,
for the present at least, admit of scarcely any other possession than that shown by the defendant
in this case. To require this sort of real estate to be enclosed, in order to prescribe, would be the
virtual abrogation of the provisions of the Code as to a large part of the wealth of the State.—
(MERRICK, C. J., dissenting.)

Code, 3453, 3466, 3467, 3389, 3399, 3400.

APPEAL from the District Court, Fifth District, Parish of Assumption,
Cole, J. *Bonford & Gentile,* for plaintiffs. *Illsley,* for defendant and
appellant.

SPOFFORD, J. (MERRICK, C. J., dissenting.) This cause has formerly been
before this court, upon a peremptory plea of *res judicata* interposed by the de-
fendant and sustained by the District Court. We reversed the judgment, over-
ruled the plea, and remanded the cause for a trial upon the merits. See 10th
An., p. 193.

There has been a judgment against the defendant, and he, in his turn, has
appealed.

The action is petitory; its object is to recover a certain tract of land contain-
ing 240 arpents on the bayou Lafourche, in the parish of Assumption.

The defendant holds (through mesne conveyances) under a tax sale made by
the State Treasurer in 1828, for taxes alleged to have been due by the plaintiff
*Dodeman.* The land was described in the adjudication merely as "a certain
tract or parcel of land situated in the parish of Assumption, measuring six ar-
pents, more or less."

In forced alienations of real property, it is essential that there should be a

DODEMAN
*r.*
BARROW.

reasonably certain description of the property seized and sold. The laws requiring transfers of immovables to be in writing, would be vain and illusory if the thing sold were not required to be described in writing. In forced sales, especially, it is necessary for the description to be such as to warn the public what is intended to be sold; that the purchaser may be able to identify the object of his purchase, and that the property of the original owner may not be sacrificed by a sale in the dark. *Wilson* v. *Marshall*, 10th An., p. 327.

We are of the opinion that the State Treasurer's adjudication to *Mooney* (under whom the defendant claims) of "six arpents, more or less, in the parish of Assumption," unaccompanied as it was by a delivery of possession, did not convey to *Mooney* a legal title to the specific 240 arpents claimed in this action.

And we have heretofore decided that the monition law was not intended to cure such a substantial defect in the sale as this.

As the only title set up by the defendant is traced from *Dodeman* through the tax sale to *Mooney*, *Dodeman* must recover unless his title has been lawfully divested, or unless the defendant's plea of the prescription of ten years is valid.

Upon the former point we have said enough. The latter requires a brief notice.

It does not appear that *Mooney*, who, it is pretended, bought this land at the tax sale aforesaid, ever went into possession of it.

In 1838, *Mooney* sold the tract now sued for to one *High*, reciting the sale for *Dodeman's* taxes as the origin of his own title. But it is not shown that *High* ever took possession.

About a month after his purchase, *High* sold the tract to the defendant *Barrow*; but having no possession, either actual or civil, himself, he could transfer none to his vendee.

*Barrow* then was bound to prove a corporeal possession in himself as the starting point of his title by prescription.

The incidents of the possession under title, which will enable one to acquire an immovable by the prescription of ten years, are explicitly laid down in Article 3453 of the Louisiana Code; it must be a possession in fact and right as owner; it must be continuous and uninterrupted, peaceable, public and unequivocal. The incidents of possession to support the prescription of thirty years without title, are the same: the possession on which this long prescription is based, "ought to have the other qualities which are necessary to the prescription of ten and twenty years, i. e. it must be continuous and uninterrupted during all that time; it must be public and unequivocal and under the title of owner." C. C., 3466. And it is only when it has been "commenced by the corporeal possession of the thing," that the possession "may be preserved by external and public signs announcing the possessor's intention to preserve the possession of the thing, *as the keeping up of roads and levees*, the payment of taxes, and other similar acts." C. C., 3467.

The only *indicia* of a taking of possession by *Barrow* previous to 1844, which we find to be satisfactorily established by the evidence, are the two facts that in 1840 he sent hands to aid in stopping a crevasse in front of the tract in question, and that the next year, some of his negroes worked on a road and levee running over a part of it.

We think it would be contrary to the text and meaning of the Code, to declare these *indicia* sufficient to establish such an unequivocal corporeal posses-

sion, *animo domini*, as is required to mark the commencement of the prescription of ten years.

The defendant had other lands in the vicinage. He had then an obvious interest in stopping the crevasse and assisting to keep the road and levee in repair, and his doing so did not clearly indicate an intention to take possession of this piece of land as owner.

In 1844 or 1845, he did take unequivocal possession. The witnesses, without dissent, speak of that as the marked epoch when he began to use and cultivate the land. But prior to that time, we do not find that he cut a tree or dug a ditch, or built any kind of structure, or planted upon this land, although from one fourth to one third of it had been cleared many years anterior to his purchase.

The plea of prescription does not appear to us to be tenable, as citation was served upon the defendant in August, 1851.

We find no sufficient evidence to prove that *Barrow* was in bad faith whilst reaping fruits and making improvements, before this suit was instituted, and he has a legal presumption in his favor.

Upon the subject of rent and improvements, there is the usual discrepancy in the evidence.

The District Judge, who saw and knew the witnesses, had a better opportunity to graduate the amounts which should be allowed to either party, and although both complain of his estimates, we are not prepared to say that they were erroneous or unjust.

The judgment is therefore affirmed, with costs.

MERRICK, C. J., dissenting. I have not been able to concur in the view taken of this cause by the majority of the court.

The principal defence to the action, is the plea of prescription of ten years.

The Judge of the lower court was of the opinion that the defendant was a possessor of the land in question in good faith, but that the proof did not show a possession extending back a sufficient period to enable him to prescribe against the plaintiff's title. The tract of land seems to have been cultivated many years ago, and being covered with coco, was abandoned by the plaintiffs about the year 1827 or 1828. It is not shown that they exercised any act of ownership over the land, from that period until the institution of the suit, a period of twenty-two or twenty-three years, and under Article 3467 C. C., it would seem that the plaintiffs have lost their civil possession because they did not pay taxes, keep up the roads and levees, or do other similar acts.

The Judge of the lower court seems to have believed the witnesses who testified as to defendant's acts of ownership, but he did not think they proved enough to establish the plea of prescription.

It appears that the defendant *Barrow* caused his title to be recorded.

He published a monition in the parish where a part of the plaintiffs reside, describing the tract of land in controversy, and obtained a judgment homologating the tax title.

*R. C. Davis*, a witness, says: "At *Barrow's* request, I worked on the road with the slaves of *Barrow*, in the early part of 1838, and afterwards repaired the roads and levees and ditches on the land. *Barrow* had then and still has the actual and exclusive possession of said land as owner and proprietor thereof. I had for many years, and since 1838, brought a number of negroes every year, working on the land, repairing the roads, levees, etc., cutting ditches on

the whole front of the land, and also towards the rear, I cannot say how far back. The land was certainly in possession of *R. R. Barrow* in the spring of 1838. I heard him say he purchased it on or about May, and it is now in his possession and has been since he purchased it, in 1838."

*A. V. Rogers* says: "In the early part of the year 1838, I met with said *Barrow* on the land, working the road with negroes, and ditching."

In another place, he says: "I saw *Barrow* working on the land, that is on the road, with his negroes, in the early part of the year 1838."

*Dr. T. A. Dozier* testifies that he resided with *R. R. Barrow* prior to 26th of November, 1838; that some time previous to this date, "whilst riding along the bayou, he saw ten or fifteen negroes working with different implements, such as hoes, spades and axes, as it appears to him, but does not recollect exactly; working in different directions on the plantation and on the road." He ascertained at the time that the negroes belonged to ·*Barrow* ; thinks there were one or two white men there; he stopped a few minutes and talked with them. After this, he saw them again at work there.

*Harrison Benton* says, that in 1838 or 1839, he saw 12 or 15 negroes of *Barrow* working on the ditches and road in front of the land.

It is also established by abundant testimony, that in May or June, 1840, there was a crevasse upon this land. That to prevent it, *Barrow* had sent for some negroes owned by him in partnership with another; that he employed and paid the white laborers upon the crevasse, and that the overseer and slaves remained in an old store-house (magasin) whilst they were there at work. The proof shows that *Barrow* continued to keep up the roads and levees, and that in 1844 or 1845, he enclosed the land and cultivated it as a part of his sugar plantation.

If this testimony is to be believed, and it is opposed by negative testimony only, I think that the plea of prescription is sustained by it. As already observed, not the slightest act of ownership had been exercised over the place by *Dodeman* or his children, after its sale for taxes.

*Barrow* gave notice to all the world, in 1838, by his monition published in French and English, that he claimed the land, and it was adjudged to him by the court; hence his acts had unusual publicity.

The testimony shows that the land was probably of no value for cultivation to the plaintiffs. One of the witnesses says it was nothing but a " coco patch."

I think, therefore, the acts of *Barrow* were all that were needed to vest the possession in him. He had paid a full price for the land. He had done every act indicating ownership which the nature of the land admitted. It was probably useless for all purposes of cultivation, except for sugar, and it did not become valuable for that purpose until he bought the adjoining lands which then gave sufficient size for a plantation.

The Civil Code defines possession to be the detention or enjoyment of a thing which we hold or exercise by ourselves or another who keeps or exercises it in our name. C. C., 3389.

Detention consists in keeping a thing under our power. 1 Zacharie, section No. 184.

To be able to acquire possession of property, two distinct things are required:

1st. The intention of possessing as owner;

2d. The corporeal possession of the thing. C. C., 3399.

The Civil Code gives examples of this corporeal possession in Article 3391,

but it leaves it to the discretion of the court to judge what act constitutes possession. It is expressly provided by the Code that "It is not necessary however that a person wishing to take possession of an estate, should pass over every part of it. It is sufficient if he enters on and occupies a part of the land, provided it be with the intention of possessing all that is included in the boundaries. C. C., 3400.

That able jurist, Judge Bullard, in the case *Lecomte* v. *Smart*, 19 L. R., 489, says: "If the defendant had taken possession of the land under an apparent title, we should regard slight acts as evidence of an intention to take possession; but when a man, without any *pretence of title*, goes upon land which he is informed is claimed by another, he must show unequivocal and continued acts of possession for more than a year, to maintain the plea of prescription." While the positive acts of the defendant are shown on the one hand, much can be inferred on the other, from the passive conduct of the plaintiffs, which seems to amount to an intention to rid themselves of the burden of taxes and keeping up levees, abandoning the property to *Mooney* and his vendees. Quem ad modum nulla possessio, adquiri nisi animo et corpore potest: ita nulla amittitur, nisi in qua utrumique in contrarium actum est. ff. Lib. 41; T. D. L. 8; C. C., 3467.

Three fourths of the territory of the State, consisting of forests, prairies, swamps and woodlands, for the present at least, admit of scarcely any other possession than that shown by the defendant in this case. To require this sort of real estate to be enclosed, in order to prescribe, would be the virtual abrogation of the provisions of the Code on the subject of prescription as to a large part of the wealth of the State.

I think that prescription should protect the defendant against the claim of all of the plaintiffs, except perhaps the minor *Angelique Dodeman*.